**KISTLER INSTRUMENTE AG**

v.

**The UNITED STATES.**

No. 324–75.

United States Court of Claims.

June 18, 1980.

Paul M. Craig, Jr., Washington, D. C., attorney of record, for plaintiff. Melvin Kraus, James F. McKeown and Craig & Antonelli, Washington, D. C., of counsel.

Donald E. Townsend, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant. Thomas J. Byrnes, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Joseph V. Colaianni, filed August 17, 1979, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case and, accordingly, plaintiff is entitled to recover with judgment entered for plaintiff as set forth in the following Conclusion of Law.

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge: Plaintiff seeks, pursuant to 28 U.S.C. § 1498, reasonable and entire compensation for the unauthorized manufacture and use by or for the Government of piezoelectric transducers and links for determining the forces transmitted between at least two components of a structural assembly.[1] The patent in suit,

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts are necessary to the decision are contained in his opinion.

United States Letters Patent No. 3,151,258 (Sonderegger or '258 patent), entitled "Device for Measuring the Forces Between Components of an Assembly," issued to Hans Conrad Sonderegger and Walter P. Kistler on September 29, 1964, on an application filed in the United States Patent and Trademark Office on December 7, 1961. The application claimed priority based upon a Swiss patent application filed on December 10, 1960. Plaintiff, Kistler Instrumente AG (KIAG), has always been and continues to be the sole owner of the patent in suit. Infringement of claims 1–8 was alleged in the petition, but during the pretrial proceedings, the allegation of infringement of claim 5 was dropped. Therefore, claims 1–4 and 6–8 are the only claims which plaintiff presently alleges to have been infringed by or for defendant.

Defendant has asserted a host of defenses to plaintiff's action, including: invalidity, noninfringement, license, and misuse. Since no findings of fact have been proposed with respect to the misuse and license defenses, and defendant has not addressed either misuse or license in its brief, defendant is deemed to have abandoned these defenses. *Lockheed Aircraft Corp. v. United States*, 553 F.2d 69, 213 Ct.Cl. 395 (1977); *Grover v. United States*, 200 Ct.Cl. 337, 354 (1973).

The parties have agreed that a determination of plaintiff's recovery, if any, would be deferred until a final ruling by the court on the issue of liability.

 For the reasons stated hereinafter, it is concluded that claims 1–3 and 8[2] are valid and infringed and the force gauges supplied by PCB Piezotronics, Inc. (PCB) are found to have been used and/or manufactured by or for the defendant without authorization or license from plaintiff.

1. The accused devices were all supplied to defendant by PCB Piezotronics, Inc.

2. Claims 4, 6 and 7 are found not be be infringed for reasons stated more fully hereinafter.

## The Patent in Suit

The patent in suit relates to a device for measuring forces between the components of an assembly, and more particularly, to a piezoelectric quartz crystal force measuring device for measuring both tensional and compressional forces within a machine assembly.

Plaintiff's force transducer forms an integral constructional part of the assembly itself, and takes over not only the measuring function, but also the action of the particular element of the assembly it is designed to replace. The quick and simple substitution of the transducer in the structural assembly is done without sacrifice in accuracy of results. It is designed to be useful in a variety of different applications, as a universal exchangeable machine element. Although the load cell is preferably in the shape of a washer, it can also be in the form of a nut or spacer.

When the force measuring transducer of the '258 patent assumes the form of a washer, the device comprises two apertured discs with piezoelectric quartz crystals interposed between them. The electrode for supplying the output of the transducer is sandwiched between the two quartz crystals. The periphery of the lower disc is provided with a sleevelike projection. This projection extends perpendicular to the flat surface of the disc and its end is flanged around the outer edge of the upper disc. In this manner, the crystals are prestressed and the transducer sealed from the elements. The prestressing of the crystals is essential to ensure a linear operation of the gauge and generate an output signal which is proportional to the applied force.

When secured, for example, under the head bolt of a diesel engine, the transducer will function to produce an output signal proportional to the stress in the head bolt under engine operating conditions. A sliding or anti–friction washer is utilized between the bolt and the surface of the transducer closest to the underside of the bolt. As a result, rotational forces created when the bolt is being tightened against the force gauge will not damage the crystals.

In operation, the entire force transmitted between the assembly components in which the cell is placed is applied to the two quartz crystals. As a result of the piezoelectric properties of the crystals, a voltage proportional to the compressive force applied to the crystals is generated. This voltage is then amplified by internal or external electronics and the result, which is indicative of the applied force, displayed for use by the operator of the gauge.

Claim 1 is the only claim at issue which is in independent form. All other claims are dependent on claim 1 and thus, in addition to the elements and limitations contained in these particular claims, also include all of the elements and limitations of the claims upon which they depend. These claims, in indented form to set out the elements and for ease of reference, read as follows:

1. A device for measuring forces between at least two components of a structural assembly, wherein at least one of said components is in the form of an exchangeable machine element,

 (a) comprising component means having the physical dimensions of, and being capable of permanent substitution for, said machine element,

 (b) and at least one piezo–electric crystal means lodged within said component means and serving as means for measuring the forces transmitted between said components.

2. A device according to claim 1, wherein said component means is in the form of a washer.

3. A device according to claim 2, wherein

 (a) said washer comprises two discs,

 (b) and said crystal means is interposed between said discs.

4. A device according to claim 3, wherein one of said discs is provided at its periphery with a sleeve–like projection extending perpendicularly to the outer surface of said discs, said projection forming the peripheral surface of said washer and being flanged on the edge of the other one of said discs.

\* \* \* \* \* \*

6. A device according to claim 2, wherein said washer has therein an annular recess substantially parallel to the faces of said washer and serving to receive said crystal means.

7. A device according to claim 6, further comprising a thin–walled sleeve incorporated in the edge parts of said discs for closing off said recess and pre–stressing said crystal means.

8. A device according to claim 2, wherein said washer serves to support a nut forming part of said assembly, further comprising a slider ring on the side of said washer facing said nut.

Plaintiff's testimony at trial and the specification of the patent in suit stress the complicated procedure which mechanical designers in the 1950s faced in attempting to establish the magnitude of forces transmitted between components of a structural assembly. Force measurements between components of engines in the mid– to late '50s were made by strain gauges. However, the measurements were of necessity made on the outside of the structure, and, therefore, calculations were required to estimate the forces transmitted through the structure.

In addition, the stress gauge had to be connected into a working wheatstone bridge arrangement. This in turn required, among other things, a source of power and an appropriate meter. If measurement of the force through a bolt was desired, the bolt had to be instrumented. This process required the removal of a portion of the threads of the bolt so that at least four strain gauges could be cemented about the shank of the bolt. In addition to the fact that the modification of the structural integrity of the bolt rendered the results suspect, the leads from the four gauges complicated the insertion of the bolt into the engine.

It was a time–consuming and costly process and it was not uncommon to require from 1 to 2 weeks of time to obtain the force measurements for a single bolt. Moreover, having finally obtained the reading, it was then necessary to remove the strain gauge equipment and return the engine to its normal operating design.

The desire to obtain force readings between components of diesel engines in a quick and accurate fashion, without alteration of the engine, by an instrument which could, if desired, be left permanently in the engine and would require no cleanup, ultimately resulted in plaintiff's patented invention.

To eliminate the use of the many lead wires and the necessity of an outside source of power, the co–inventors, due to their previous experience with quartz as a piezoelectric pressure transducer, decided to utilize it as their sensing material. There was, however, considerable concern about the ability of quartz to withstand the forces which bolts in locomotive diesel engines were subjected to. The recognition by Mr. Sonderegger, one of the co–inventors that the area ratio of a washer to the shank of its accompanying bolt was always 6 to 1, gave him confidence that a quartz transducer could withstand any compression stresses that it would encounter. The maximum bolt stress experienced by high alloy steel is approximately 180,000 p.s.i. Thus, as a result of the 6 to 1 ratio, a transducer will experience about 30,000 p.s.i. of compressive stress. Since 80 percent of plaintiff's load transducer area is covered by quartz, and since quartz crystal material can withstand about 50,000 p.s.i. without any aging effect, the inventors were satisfied with the efficacy of their design.[3] Later tests bore out the accuracy of the co–patentee's theoretical calculations and expectations.

### Scope of Claims

Defendant maintains, because of the disagreement between counsel, that the meaning of various terms[4] in the claims must be

---

3. The testimony at trial indicated that no piezoelectric ceramic material then or now on the market is able to withstand this amount of compressive stress.

4. Although the meaning of the term "an exchangeable machine element" is discussed at this point, the scope and meaning of other terms are discussed in the context of the opin-

established prior to considering the questions of validity and infringement. Defendant initially requests that the scope and meaning of elements (a) and (b) of claim 1 be defined. Defendant contends that element (a) calls for an "exchangeable machine element" which has all of the dimensions of the machine element it replaces. Thus defendant argues that a transducer built according to the patent in suit must have "all of the dimensions of the part it replaces in a constructional element, and that an instrumented washer–shaped transducer would have the same *thickness* as the relatively thin washers sold and used in the United States."

Defendant points to the following language, which appears at col. 2, lines 2–19 of the patent specification, for support:

> [T]he measuring element forms an integral constructional part of the assembly itself and takes over not only the measuring function but the true action of the particular element associated with the constructional group concerned.
>
> Since in this case a machine element is involved which is exchangeable with the corresponding normal element, the measuring device according to the invention can be inserted without any alteration in the construction of the group and without any additional provision, once and for all. It relates therefore not to a measuring device specifically designed for one application–for example on the measuring stand or in the laboratory–but rather the measuring element remains as a normal machine element in the constructional assembly concerned and hence permits the forces to be measured to be constantly supervised or for measurements to be taken periodically and, in fact, in practical operation.

In addition, defendant refers to col. 3, lines 40–47, of the specification, which states:

The washer has the normal dimensions for the particular screw joint and differs in no way from a normal washer as regards its outer dimensions. There is obtained by the arrangement described a measuring element which can be inserted into new or existing constructions without any special provision and in the simplest way, which permits the axially exerted forces to be measured and supervised constantly or periodically.

Defendant also directs attention to selected portions of the trial transcript to discern the "intent of the inventors," with regard to element (a) of claim 1.

A careful review of the testimony fails to persuasively support defendant's arguments. The most that can be said is that witnesses for both plaintiff and defendant agreed that to be an "exchangeable machine element" the part must have the same form and structure, perform the same function as the element it is replacing, and be able to be substituted without preparation. Mr. Sonderegger, for example, testified that the inside and outside diameters of a washer are important but that for the function it serves a washer's thickness is not an important consideration. Professor Peter K. Stein, defendant's expert witness, substantially agreed with this, for in response to a question asking him to identify the critical dimensions of a washer, he testified that, in order of importance, the inside diameter was the most critical, the outside diameter was much less critical, and that the thickness may or may not be critical. The other co–inventor, Mr. Kistler,[5] similarly testified that the thickness of the cell was not important, unless it prevented a nut in the structural assembly under test from assuming a proper position on the threaded shank of a bolt.

The above testimony explains the change in emphasis regarding the transducer's dimensions which occurred during prosecution of plaintiff's patent through the Patent Of-

ion at times when such discussions will be more meaningful.

**5.** Mr. Kistler, in addition to being a co–patentee, is a major shareholder of Kistler Instru-

mente AG, and the founder, along with Mr. Sonderegger and others, of the Kistler Instrument Company.

fice. Defendant correctly points out that courts will normally interpret the words of a claim in accordance with the explanation given in the patent's specification. However, the history and coverage attempted by the application's abandoned claims may be equally important. Thus in the instant case we find that plaintiff's original claim 2 called for a machine element which "embodies the normal outer dimensions for such parts."

In response to a rejection by the Patent Office, which had nothing to do with the dimensions of the force gauge, plaintiff explained that "claim 2 has been omitted with a view to reduce the number of claims, without prejudice to its patentability." In place of the original 15 claims, plaintiff submitted new claims 16 through 28 which were later allowed and ultimately issued as claims 1–13 of the patent in suit.

It is significant that none of the claims in the patent which ultimately issued contain the narrow limitation of original claim 2 in calling for the transducer to have the "normal outer dimensions" of the part it was to replace. It must be concluded that the Patent Office did not feel that this was a critical limitation. Thus, defendant's insistance upon this court's reading back into the claims limitations which were originally there and were removed during prosecution

of the application through the Patent Office cannot be permitted.

### Validity

Turning now to a consideration of each of defendant's defenses, attention is initially directed to its validity defense.

Defendant contends that the claims in issue are invalid under 35 U.S.C. §§ 102(a),[6] (b),[7] (e),[8] (g),[9] 103, 112 and 119. Specifically, it is urged that Endevco Models 2103, 2104 and 2106, the Naval Research Laboratory/National Bureau of Standards (NRL/NBS) devices, the Shoor patent, No. 3,307,054 (Shoor or '054 patent), the Gulton Industries force gauge, the Plunkett/Samsel device, the 910 load cell, and a textbook, entitled *Introduction to Piezoelectric Measurement Techniques*, by W. Gohlke, are all prior public knowledge and anticipate the claimed invention under 35 U.S.C. § 102(a). In addition, defendant argues that all of the above—mentioned devices and references were either patented or described in printed publications or on sale more than 1 year prior to the date of the application from which the '258 patent issued within the meaning of 35 U.S.C. § 102(b). The defendant also alleges that the claimed invention was described in the Shoor patent prior to its invention by plaintiff which invalidates the '258 patent under 35 U.S.C. § 102(e). Finally, defendant contends that all of the

6. 35 U.S.C. § 102(a) in pertinent part provides:
 "A person shall be entitled to a patent unless–
 "(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or"

7. 35 U.S.C. § 102(b) in pertinent part provides:
 "A person shall be entitled to a patent unless–
 $*$ $*$ $*$ $*$ $*$ $*$
 "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or"

8. 35 U.S.C. § 102(e) in pertinent part provides:
 "A person shall be entitled to a patent unless–
 $*$ $*$ $*$ $*$ $*$ $*$

 "(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or"

9. 35 U.S.C. § 102(g) in pertinent part provides:
 "A person shall be entitled to a patent unless–
 $*$ $*$ $*$ $*$ $*$ $*$

 "(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

above prior art, with the exception of the 910 load cell and the Gohlke text, discloses inventions which individually anticipate the claimed invention under 35 U.S.C. § 102(g). Defendant also maintains that the prior art collectively renders the claimed invention obvious within the meaning of 35 U.S.C. § 103.

Defendant contends further that plaintiff's disclosure does not comply with the portions of the first paragraph of 35 U.S.C. § 112 that specifically relate to enablement and best mode requirements. For the reasons which follow, each of these contentions is found to be unsound and is accordingly rejected.

Addressing defendant's § 102 arguments first, it is urged that Endevco Models 2103 and 2104 force gauges anticipate claim 1 of the '258 patent. These devices are force gauges which utilize two solid ceramic piezoelectric discs housed in a cylindrical structure with threaded holes at either end for mounting the gauge. Unlike a typical washer or a nut, these gauges are not provided with a central mounting aperture and thus they cannot be readily placed in service by being secured by or to a bolt that comprises a portion of the machine or structural assembly whose stress is being measured. These gauges are not in the form of machine exchangeable elements, nor is it clear that they accurately measure for the force applied to them since testimony at trial indicated that they had problems with both nonlinearity and the effects of temperature.

The testimony of record indicates that Endevco utilized the thick sidewalls of the Model 2103 and 2104 gauges to prestress a ceramic transducer. In actual usage Endevco found that this design contained a number of flaws that detracted from the 2103 and 2104 force gauges' ability to accurately measure forces. In the first place, it is imperative that the prestressing applied to a crystal be uniform. If this is not done, the linearity of response of the gauge will be affected. Endevco found that if the housings for the 2103 and 2104 cells were eccentrically formed so that one wall was even slightly different–thicker or thinner– from the other wall, unequal prestresses would be applied to the crystal.

In addition, Endevco also found that the thick sidewall design affected the performance of the cell in still another significant manner. Specifically, exposure of the cell to wide temperature variations resulted in the sidewall's contracting or expanding at a different rate than the ceramic disc. Thus it was possible for the cell to lose its entire prestress capabilities. With the loss of its prestress, a ceramic crystal is no longer capable of linear response to the applied load.

Finally, Endevco's 2103 and 2104 load cells operated in a significantly different manner from plaintiff's. In plaintiff's load cell, substantially all of the applied load passes through the quartz transducer and thus the cell's response was directly proportional to the applied force. However, in Endevco's 2103 and 2104 models, only a portion of the load is passed through the ceramic transducer and a significant portion of the load is purposely short–circuited through the thick sidewalls.

Considering defendant's § 102(b) arguments, even assuming these devices were on sale and/or in public use more than 1 year prior to plaintiff's December 10, 1960, filing date, Models 2103 and 2104 do not anticipate the invention as recited in claim 1 of the '258 patent, for the reasons stated above, and thus would not invalidate that claim under 35 U.S.C. § 102(a) or (b). For the same reasons, defendant's contention that these force gauges invalidate claim 1 of the '258 patent in suit under 35 U.S.C. § 102(g) is equally without merit.

In sum, since it is necessary that 35 U.S.C. § 102 prior art, in order to negate novelty or antedate an invention, contain all of the elements of the invention or their equivalent in a single reference or structure, defendant's 2103 and/or 2104 defense cannot be sustained. *See Eastern Rotorcraft Corp. v. United States*, 397 F.2d 978, 184 Ct.Cl. 709 (1968).

Defendant next urges that claims 1 and 2 of the '258 patent are invalid within the

meaning of 35 U.S.C. § 102(a), (b) and (g) in view of the NRL/NBS devices and Endevco Models 2106 and 2110.

For purposes of this discussion, it will be assumed that the 2106[10] gauge was offered for sale to General Electric prior to the December 10, 1960, filing date of KIAG's Swiss patent application. The Model 2106 force gauge was designed to avoid the problems which Endevco encountered in using thick sidewalls to prestress the ceramic crystal in its 2103 and 2104 models. Thus, whereas a portion of the applied force was directly applied to the ceramic crystals of the 2103 and 2104 for measurement, the 2106 utilized three spaced Poisson ratio columns to avoid a direct transmission of the applied force through its ceramic transducers.

In operation, the forces are applied to the upper plate of the 2106 cell, and because the Poisson ratio columns only occupy approximately 10 percent of the surface areas to which the load is applied, only approximately 10 percent of the applied load flows through the columns to the bottom plate. The remaining load is short–circuited directly through the housing to the bottom plate. The application of a compressive force to the Poisson columns results in an incremental change in their diameters. Annular ceramic crystals are press fitted to each of the columns to respond to the changes in diameter and generate a voltage proportioned to the change.

This operation is to be contrasted with plaintiff's load cell where substantially all of the applied force flows directly through the quartz crystal for measurement. Indeed, the language of claim 1 which calls for the "piezo–electric crystal means lodged within said component means and serving as means for measuring the forces transmitted between said components," is found, after review of the specification, drawings, file history, and testimony of record, to require an operation where the applied forces flow directly through the transducer for measurement.

Although the Model 2106 force gauge, which is about 1 inch high and 2 inches in diameter, was described at trial to have the shape of a hockey puck, and was designed for use with a standard ½ inch bolt, it is clearly not in the general shape of a washer, as are the devices disclosed in the patent in suit. It thus is not a machine exchangeable element within the meaning of that phrase as used in claim 1. The Endevco 2106 force gauge does not contain all of the elements of the patented force gauge or their equivalents. It accordingly does not anticipate either claims 1 or 2 of the '258 patent, and it cannot be said to invalidate those claims under 35 U.S.C. § 102(a), (b) or (g).

Defendant next argues that devices developed at the Naval Research Laboratory and at the National Bureau of Standards anticipate the patent in suit. It should initially be stressed that both the NRL and NBS devices are piezoelectric accelerometers that were specifically designed to detect vibratory movements. All accelerometers employ piezoelectric ceramic sensing elements mounted in a housing. The sensing element usually is mounted with one of its faces in contact with a wall of the housing, and the other face in contact with an inertial member or mass, but otherwise isolated from the walls of the housing. The inertial member or mass acts to preload the crystal. Accelerometers are employed in the testing and design of aircraft and other machines by mounting them securely to the machine or structure in question and then vibrating the part or machine. Upon vibration, a vibratory force acts on the housing to cause the inertial member or mass to develop an equal and opposite force. Thus the accelerating force to be measured further compresses or relaxes the crystal preload and results, in accordance with the relationship that force equals mass times acceleration, in an electrical charge due to the piezoelectric effect of the crystal.

---

10. Endevco Model 2110 is a mechanical impedance head constructed of a Model 2106 force gauge and three accelerometers incorporated therein. Since the Model 2106 will be shown not to invalidate the subject claims under any of the cited § 102 paragraphs, neither can the Model 2110 render claims 1 and 2 invalid under those paragraphs.

As explained at trial, accelerometers are designed to respond only to acceleration and to be substantially nonresponsive to the application of compressive forces. Indeed, since an accelerometer is designed so that the crystals are not in contact with both the top and bottom plates of a cell, the response of an accelerometer to a nonvibratory–type force would be of questionable accuracy.

With the above background, attention is again directed to the NRL/NBS accelerometers. These devices each used ceramic–type transducers. One face of the transducer was mounted to the accelerometer's base and its other face was mounted to a block of metal which preloaded the crystal. The NRL device was developed in 1949, while the NBS device was described in the November 1951 edition of *Radio–Electronic Engineering*. These devices were provided with a tapped stud for mounting to the machine under vibratory test.

Neither the NRL nor NBS devices are in the form of a machine exchangeable element, as required by claims 1 or 2 of the patent in suit. In addition, because the devices are mounted to a machine for vibration, the piezoelectric crystal means do not serve "as means for measuring the forces transmitted" between components of a structural assembly, as also required by claim 1.

Accordingly, neither the NRL nor the NBS devices are found to anticipate either claims 1 or 2 of the patent in suit under 35 U.S.C. § 102(a), (b) or (g).

Defendant next urges that all of the claims in issue, namely 1–4 and 6–8, are invalid under paragraphs (a), (b), (e), and/or (g) of 35 U.S.C. § 102, in view of United States Letters Patent No. 3,307,054 which issued to Bernard A. Shoor on February 28, 1967, on an application filed February 12, 1960. It appears that prior to 1960, Endevco did market a ceramic piezoelectric accelerometer having a design as shown in Figs. 1 and 2 of the '054 Shoor patent. These accelerometers, generally in the shape of washers, were designed to be attached to the surface of the machine to be tested by a central mounting hole.

Defendant places great reliance upon the following language which appears at col. 5, lines 62–64, of Shoor:

Furthermore, the invention is not limited to the measurement of acceleration but may be employed in instruments that measure force or pressure.

Defendant thus urges that the Shoor patent renders plaintiff's patent invalid.

As explained hereinbefore, an accelerometer operates in a manner totally different from the patent in suit, to measure vibratory motion. The Shoor patent does not disclose how to modify the structures shown to be capable of accurately measuring forces, and even if it did, the modified structure would in no way resemble or operate like the load cell claimed and disclosed by the patent in suit.

■ It has long been established that in order to anticipate a subsequent device, the specification of a patent must do more than merely indicate that the disclosed device may be used to perform another function. As stated in *Straussler v. United States*, 339 F.2d 670, 671, 168 Ct.Cl. 852, 854 (1964):

The test for determining if a reference anticipates a claim of a patent is whether the reference contains within its four corners adequate directions for the practice of the patent claim invalidated. * * * Stated another way, the reference must disclose all the elements of the claimed combination, or their mechanical equivalents, functioning in substantially the same way to produce substantially the same result.

The prior Shoor patent fails to meet these requirements. In fact, the above–cited language from Shoor is the only reference made to the use of the Shoor structure for anything other than an accelerometer. The Shoor patent not only does not indicate how the accelerometer could be used as a force gauge, but it fails to explain what changes must be made to the accelerometer to have the "modified" structure accurately respond to force.

Evidence at trial also indicated that the piezoelectric transducer industry in general

has evolved over the years in such a way that companies tend to develop transducers for particular rather than universal application. Therefore, a designer of a piezoelectric force gauge would always attempt to minimize the response of the gauge to such unwanted effects as acceleration, temperature and pressure. While an accelerometer may be force sensitive to a certain degree, the designer of an accelerometer strives to make it as insensitive to force as possible. In the Shoor patent, the gaps between the piezoelectric crystal and the housing are obvious attempts on the part of the designer, Mr. Shoor, to minimize the unwanted effects of force on the measurement of acceleration. It is thus clear that Mr. Shoor intended his device to be first and foremost an accurate accelerometer. Since this patent does not anticipate nor describe the invention defined in claims 1–4 and 6–8 of the '258 patent, it does not render them invalid under 35 U.S.C. § 102(a), (b), (e), or (g).

Defendant also argues that claim 1 of the patent in suit is invalid under 35 U.S.C. § 102(a), (b) and (g), in view of the Gulton Industries and Plunkett/Samsel accelerometers.

The Gulton Industries device, which is shown in United States Patent No. 3,359,-441, filed November 16, 1959, and which issued December 19, 1967, to Mr. Anthony W. Orlacchio, is an accelerometer with a ceramic piezoelectric ring bonded to a metal plate. The device is provided with a central hole to enable its attachment to an object under test. The piezoelectric crystal element in this device is mounted in a housing in a manner to substantially isolate it from direct application of force. An inspection of the Gulton Industries device reveals that it is intended for use as an accelerometer, measuring force only incidentally, as detailed above in connection with the other prior art accelerometers.

The Plunkett/Samsel device is an accelerometer whose housing is provided with a threaded bolt for attachment to the object

whose acceleration is to be measured. It consists of a seismic mass sitting atop and applying force to an annular ceramic piezoelectric crystal element. This device is not capable of substitution for a machine element, as recited in claim 1.

In addition, similar to the other prior art accelerometers, neither the Gulton Industries nor the Plunkett/Samsel devices are able to accurately "measure the forces transmitted between" the components of a structural assembly as required by claim 1 of the patent in suit. Accordingly, neither are deemed to anticipate the invention of claim 1 of the '258 patent under 35 U.S.C. § 102(a), (b) or (g).

Defendant next argues that claim 1 of the '258 patent is invalid since it is anticipated by plaintiff's own 510/910 load device. Although defendant urges that plaintiff's acts invalidate claim 1 under both 35 U.S.C. § 102(a) and (b), defendant's 35 U.S.C. § 102(a) arguments are, to say the least, confused.

Defendant's § 102(a) defense finds no support in the law.[11] In fact, a mere reading of § 102(a) is enough to dispose of defendant's arguments. Title 35 U.S.C. § 102(a) requires that the invention be known or used "by *others* in this country." (Emphasis added.) *"[O]ne's own invention, whatever the form of disclosure to the public, may not be prior art against oneself, absent a statutory bar." In re Facius*, 408 F.2d 1396, 1406, 161 USPQ 294, 302 (CCPA 1969).

Turning next to defendant's § 102(b) argument, defendant contends that the 510/910 load cell was described in Kistler Instrument Company (KIC) sales literature which was printed and published for prospective customers in the United States in January 1960. Defendant also argued that KIC sold the 510/910 load cell in late 1959 to early 1960, and that it was also demonstrated at trade shows and advertised as being suitable for measuring forces.

---

11. *Illinois Tool Works, Inc. v. Solo Cup Co.,* 461 F.2d 265, 172 USPQ 385 (7th Cir. 1972), *cert. denied,* 407 U.S. 916, 92 S.Ct. 2441, 32 L.Ed.2d 691, 174 USPQ 65 (1972).

The record fails to support defendant's contentions. Instead, the record establishes that the earliest KIC literature bears a date of January 1960. Also, the only purchase order of record indicates that the first sales of the 510/910 cell were made by KIC on November 21, 1961. Defendant has failed to prove that the 510/910 load cell was described in a printed publication in this or a foreign country more than 1 year prior to the December 10, 1960, date of plaintiff's application for patent in the United States. Accordingly, defendant's 35 U.S.C. § 102(b) defense is without merit and must be rejected.

Defendant's final argument under 35 U.S.C. § 102 contends that claim 1 of the '258 patent in suit is invalid within the meaning of paragraphs (a) and (b) of that section in view of a textbook, entitled *Introduction to Piezoelectric Measurement Techniques*, by W. Gohlke, 2d ed., published in Leipzig, Germany, in 1959. This text is recognized in the art as a standard handbook of piezoelectric measurement methods and describes devices known prior to its publication in 1959. Figure 100 of this text shows a force transducer for measuring tensional as well as compressional forces.

Quartz piezoelectric crystals are shown to be centrally mounted within a rectangular steel housing. During construction, the rectangular steel housing is stretched by external forces such that after release of the forces, a high mechanical preload is applied to the centrally mounted crystals. This design results in the short–circuiting of a large amount of the force applied to the transducer.

The record indicates that as much as 90 percent of the applied force is short–circuited through the steel housing and only a small portion of the applied force is actually received by the quartz crystals. The evidence adduced at trial does not identify the material used for the steel housing; however, Prof. Stein, defendant's expert, clearly testified that unless the material was highly elastic, linear, and hysteresis–free, such a design could lead to inaccurate results.

The Gohlke gauge is distinctly different from plaintiff's design in which the quartz crystals are acted upon by substantially all of the applied force. An additional problem with the Gohlke device is its susceptibility to the effects of temperature variation. Such effects take on even greater significance in view of the small proportion of the applied force being sensed by the quartz crystals. Temperature changes may also drastically affect the preloading of the crystals.

The device of Fig. 100 does not invalidate claim 1 of the subject '258 patent under either § 102(a) or (b), because it is not, as required by that claim, in the form of a machine exchangeable element. Moreover, the Fig. 100 device does not anticipate claim 1 since it does not disclose and/or teach the use of quartz to measure substantially all of an applied force as required by claim 1.

### 35 U.S.C. § 103

Defendant further argues that the alleged advance in the art disclosed in the '258 patent would have been obvious under 35 U.S.C. § 103 and that the patent in suit should have accordingly not been granted. Defendant initially urges that it was well known in the art in 1960 to substitute piezoelectric sensors in place of piezo-resistive sensors in force gauges. Evidence at trial showed that strain gauges were available prior to 1960 in the form of wires or strips to measure the strain or bending an of an object to which they were attached. However, all such strain gauge devices require that an external power supply be applied to the strain gauge wires in order to obtain a strain measurement from which a force measurement can be calculated. It was also well known to instrument bolts directly with strain gauge wires, as shown in Fig. 1 of United States Patent No. 2,873,341 to Mr. Ali U. Kutsay, which issued on February 10, 1959.

The evaluation of obviousness under 35 U.S.C. § 103 requires, as pointed out by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15

L.Ed.2d 545 (1966), a consideration of the following factors:

(1) the scope of the prior art;

(2) the difference between the prior art and the claims in issue; and

(3) the level of ordinary skill in the art.

■ Additionally, secondary considerations, such as commercial success, satisfying a long–felt need, or the failure of others, reflect on the determination of obviousness under 35 U.S.C. § 103.

### The Prior Art

Many examples of prior art have been brought to my attention. Most of these have been previously discussed in connection with defendant's many 35 U.S.C. § 102 defenses and will only be identified in connection with defendant's § 103 defense. Defendant, however, contends that various combinations of prior art can be made to invalidate the claims of the '258 patent. All of these suggested combinations utilize United States Letters Patent No. 2,998,585, which was issued to Messrs. Martin Bodner and Ward B. Brewer ('585 or Bodner patent), on August 29, 1961, on an application filed on May 21, 1957. It was not cited as prior art by the Patent Office during the prosecution of plaintiff's patent.

The Bodner patent shows in Fig. 2 a strain gauge device in the form of a spool having integral flanges with strain gauge wires wrapped around the spool. The load washer is provided with thin washers of lead foil, teflon foil, or a similar material, which act as high pressure solid lubricants. The flanges are permitted to flex when a force is applied to the transducer. This action results in an increase of the diameter of the washer, as in a Poisson ratio column, and produces a strain in the wires. The strain in turn results in changes in the wire's resistance. An external power supply is applied to the wires and through the utilization of an electrical resistance bridge, the change in resistance of the wire caused by the applied force is detected and the bolt load is then calculated.

The device disclosed in the Bodner patent was commercialized by the Waldale Research Company. Descriptive literature appeared and sales of this commercialized version were made prior to 1960. The Waldale version was commercially known as the LTD–107, and consisted of a washer–type force gauge wound with strain–sensitive resistance wire which undergoes a change in resistance whenever a force is applied. The resistance wire is responsive to slight variations in the expansion of the diameter of the spool around which it is wound, and therefore the surface finish and the method of applying the load makes a marked difference in the apparent strain which is read by the instrument. A further drawback with the LTD–107 is that it was temperature sensitive in the same manner as the Gohlke device discussed *supra*. Therefore, some form of temperature regulation or compensation was necessary to obtain accurate results.

The first combination of prior art which defendant urges invalidates the '258 patent under 35 U.S.C. § 103 is the application of the annular ceramic piezoelectric material of the Endevco Model 2106, *supra*, to the Bodner, *et al.*, load washer as shown below:

Combination of Bodner, *et al.*, load washer and Endevco Model No. 2106 load cell

Defendant contends that it would be obvious to one of ordinary skill in the art to substitute these piezoelectric elements for the strain wires of Bodner. Defendant urges that such a substitution would be

advantageous because it would eliminate the necessity for an external power source. However, defendant's expert witness at trial, Prof. Stein, while urging the obviousness of such a combination, also indicated that most people in the art at that time, *i. e.*, prior to December 10, 1960, would not have wanted to make such a substitution since the disadvantage of using piezoelectric transducers with operating machinery would outweigh their advantages. The biggest of these disadvantages was the ability of the piezoelectric materials to pick up stray noise levels or electromagnetic radiation. Because the resistance wire transducers are fed with an alternating current for excitation purposes, they are almost immune to this type of problem. Such a disadvantage teaches against making the suggested combination.

Defendant also contends that the combination of the Waldale LTD–107 load washer with the ceramic piezoelectric elements of either the Endevco Model 2103 or 2104 [12] force gauges would render the plaintiff's invention obvious, within the meaning of 35 U.S.C. § 103. In these combinations, the piezoelectric ceramic elements are substituted in place of the piezoresistive wires of the LTD–107, as shown below:

Combination of Waldale LTD–107 load washer with Endevco Model No. 2103–500 force gauge

**12.** Testimony at trial indicates that the 2104 evolved from the 2103–500 design and is substantially the same.

Combinations of Waldale LTD–107 load washer with Endevco Model No. 2103 force gauge

However, even defendant's own expert, Prof. Stein, indicated that he would not recommend either of these two configurations because they would be ineffective as force gauges since too much of the applied load would be bypassed through the metallic parts, and not enough of the load would be received by the crystals themselves. In addition, evidence presented at trial indicated that Endevco purposely abandoned its Model Nos. 2103 and 2104 force gauges in favor of a design which utilized the Poisson ratio effect. This change was made, as explained, *supra*, because the use of thick sidewalls to preload the crystals was found to be ineffective, and also because the preload on the crystal was affected by temperature variations to which the force gauges were exposed. Thus, the 2106, using Poisson columns, was considered by Endevco to be more accurate than its predecessors, which had utilized the ceramic piezoelectric crystals in the compression mode. Further, the Model 2106 was found to be easier and less expensive to produce and had fewer problems.

### Scope of the Prior Art

The above–discussed prior art shows that the construction of a force gauge in the form of a machine exchangeable element that would measure force between two components and could be permanently substituted for a machine element was known at the time of the Sonderegger invention.

The Bodner, *et. al.*, patent and its commercial version, the LTD–107 force gauge, teach that the concept of a force measuring gauge in the form of a machine element, such as a washer, was commercially available in December of 1960. However, both these devices differ from the '258 invention in manner of operation, since they rely upon the Poisson ratio effect. Upon application of a force, the diameter of a column expands to change the resistance of strain–sensitive or piezoresistive wire wound around the column. The change in resistance is proportional to the applied force.

The invention of the '258 patent operates such that substantially all of a force exerted on the top plate of the transducer is transmitted directly to the piezoelectric crystals to cause the generation of a proportional voltage. Only the combinations using the 2103 and 2104 devices, as suggested by defendant to invalidate the '258 patent under § 103, operate in the compression mode as does plaintiff's device. The other combination, using the 2106 device, operates using the Poisson ratio effect in the same manner as the Bodner, *et al.*, patent and the LTD–107.

### Difference Between the Prior Art and the Claims

The Sonderegger patent contains only one independent claim, claim 1, and therefore all of the defendant's 35 U.S.C. § 103 defenses will be discussed primarily in comparison thereto, since that claim must be invalidated in order to invalidate the remaining claims in issue.

Both the Bodner, *et al.*, and the LTD–107 devices are in the form of a machine exchangeable element and measure force between two components, albeit in a manner different from the patent in suit. Moreover, these devices could be permanently substituted for a machine element, and could be in the form of a washer. Thus, all of the limitations of claims 1 and 2 of the '258 patent in suit are present in these prior art devices except the requirement that "at least one piezoelectric crystal means [be] lodged" within the exchangeable machine element. Defendant argues that it was obvious in 1960 to one of ordinary skill in the art to combine piezoelectric crystal elements with the teachings of the Bodner, *et al.*, and LTD–107 devices to thereby yield the invention recited by claims 1 and 2 of the Sonderegger patent. Defendant contends that those skilled in the art would seek to make such a combination in order to eliminate extra lead wires and the external power source necessary for activating the piezoresistive elements. A power source is not necessary with piezoelectric devices since they are self–activated.

Defendant suggests, as described above, that the piezoelectric elements of the 2103 and 2104 force gauges can simply be inserted in the Bodner, *et al.*, device in place of the strain sensitive wires.

As detailed above, ample evidence was presented at trial by both Prof. Stein and Mr. Sonderegger which would teach against such a combination.

It serves no useful purpose to repeat all of the previous deficiencies that Endevco admitted to in explaining why it abandoned the 2103 and 2104 devices in favor of its 2106 design. It is sufficient to point out that Prof. Stein, defendant's expert witness, admitted during cross–examination that he would not recommend either combining the 2103 or 2104 Endevco force gauges with the Waldale LTD–107 force gauge as suggested by defendant. One of the problems that Prof. Stein recognized would result in the resistive wire of the Poisson ratio LTD–107 gauge was removed and the thick sidewall structure of both the 2103 or 2104 substituted, is that the combination would bypass too much of the load through the metallic housing and not enough of the load would pass through the ceramic crystals. Thus we have an admission from defendant's own witness that these suggested combinations would not be effective force gauges. It is therefore concluded that these combinations do not yield the invention as recited in claim 1 of the '258 patent and defendant's 35 U.S.C. § 103 defenses must be rejected.

Defendant also urges that the Bodner, *et al.*, or LTD–107 devices could be combined with the piezoelectric elements of the Model 2106a force gauge. In this instance also, ample evidence teaching against such a combination was presented at trial, as discussed *supra*.

As discussed in detail hereinabove, both Bodner and the Endevco 2106 are Poisson ratio force gauges that operate in a totally different manner from the patented load cell. Rather than repeat all of the above–discussed distinctions, it is sufficient to point out that in the main only a small portion of the applied load passes through the Poisson ratio columns of either Bodner or the 2106 devices, and the photoresistive wire of Bodner or the annular ceramic rings of the 2106 device respond in turn to the incremental change in column diameter.

There is nothing in the Bodner patent or in any Endevco literature of record which suggests that the piezoresistive wires of Bodner should be removed and replaced by the annular piezoelectric elements of the 2106 force gauge. *In re Shaffer*, 229 F.2d 476, 479, 108 USPQ 326, 328–29 (CCPA 1956). Indeed, the replacement appears to be a mere hindsight combination prompted by defendant's desire to show that ceramic elements could be used in a washer–shaped force gauge. Much more is necessary to show obviousness under 35 U.S.C. § 103. Further, even assuming that such a combination could be made, it is undisputed that the resulting combination measures force in a significantly different manner from the patent in suit, *i. e.*, a Poisson ratio measurement versus a direct flow of substantially all of the applied force through quartz transducers.

As a result of the above difference in operations, the resulting LTD–107/2106 combination fails to meet a critical element of claim 1 of the patent in suit. Specifically, claim 1 requires that the quartz crystals of the patented load cell be lodged within the upper and lower compartments of the washer to "measure the forces transmitted between" the components of a structural assembly. The ceramic crystals of the LTD–107/2106 combination are not lodged between the upper and lower plates of a cell so that substantially all of the forces applied to the top plate must pass through them. Significantly, the crystals in the LTD–107/2106 combination only indirectly respond to that small portion of the applied force which is applied to the top of the Poisson column to result in an incremental change in diameter. By sensing the incremental change in diameter, the ceramic crystals indirectly respond to a small portion of the applied force.

It is concluded that the claims in suit are drawn to subject matter which was not obvious to one skilled in the art at the time the invention was made within the meaning of 35 U.S.C. § 103. The conclusion has been reached on the basis of analyzing the prior art and the differences between the prior art and the subject matter of the claims, and ascertaining the level of ordinary skill in the art. It is clear from the trial record, and the parties agree, that the level of ordinary skill in the art is that provided by a combination of academic training and experience in the field with stress, strain, materials, machining, and quartz. While a college degree is not essential, it is necessary to be able to make calculations of stress, strain and similar problems. Since the designer of a piezoelectric transducer always attempts to minimize the effects of forces which he does not want to interfere with the measurements he desires to make, he would necessarily look to what others in the field of measuring that quantity have constructed or described. Due to this unique manner of developing piezoelectric transducers, whether they are used to measure force, acceleration, or pressure, the result has been that each company making such devices has continued to produce or specialize in one particular type of measuring transducer. For example, Endevco has become the worldwide leader in acceleration gauges, while plaintiff is the leader in force gauges.

### Other Defenses

Defendant also advances several arguments concerning plaintiff's breach of its

duty of candor to the United States Patent and Trademark Office and the invalidity of the '258 patent under 35 U.S.C. §§ 112 and 119. While all of these arguments have been carefully considered and are not found to be meritorious, only one argument will be discussed in detail.

Defendant argues that the patentees did not satisfy the best mode requirement of the first paragraph of § 112 [13] since they did not disclose nor suggest in the specification of their patent that two quartz crystals were essential, or even needed. Defendant also points out that the language of claim 1, the only independent claim in the '258 patent, recites "at least one piezoelectric crystal means lodged within said component means." From a reading of this language, defendant concludes that claim 1 calls for only a single crystal means, and consequently does not call for the best mode of operation.

■ There are two things drastically incorrect with such a best mode argument. In the first place, it is elementary patent law that the inventor must disclose to the Patent Office the best mode contemplated, *at the time of filing his application. In re Gay,* 309 F.2d 769, 772, 135 USPQ 311, 315 (CCPA 1962). There is no evidence indicating that either of the two inventors, Mr. Sonderegger or Mr. Kistler, did not disclose the best mode as they contemplated it at the time of filing the United States application.

Secondly, the drawings, especially Figs. 1, 2, 3, 4, 5, and 6, clearly show two layers of crystals being used in each of the force gauges depicted. That two quartz crystals are needed appears from even the most cursory reading of the specification, especially col. 3, lines 23–30 and lines 64–70, and col. 4, lines 5–11 and lines 31–40.

Moreover, defendant's argument regarding the language of claim 1 is not under-

stood. Anyone with even the most rudimentary understanding of the English language understands "at least one piezo–electric crystal means lodged within said component means," to mean one or more crystals. Certainly, if the patentees intended that claim 1 was to cover one and only one piezoelectric crystal, they would have changed the above–quoted language to read "one piezoelectric crystal means lodged within said component means."

No useful purpose is seen in burdening this opinion with any further discussion of similar arguments by defendant regarding 35 U.S.C. § 112 or plaintiff's duty of candor to the Patent and Trademark Office.

*Infringement*

Defendant further contends that even if the patent claims in issue are valid, the accused PCB force gauges and force links do not infringe.

Attention initially focuses on the accused PCB force links. A thorough review of the record fails to support plaintiff's charge of infringement. As can best be ascertained, the accused force links consist of a force washer with an additional nut mounted to its upper and lower plates.

Nothing beyond the testimony of plaintiff's own chief witness, co–patentee Sonderegger, is needed to dispose of plaintiff's charge of infringement. Specifically, when asked if the accused PCB force links were in the form of an exchangeable machine element, he replied:

> You would never find any machine element of that sort. We could look through all the machinery books.

Accordingly, since claim 1 requires that the device be in the form of an exchangeable machine element, the accused PCB force links are found not to infringe. Moreover, since all of the remaining claims in suit are dependent upon claim 1, none of the other

---

**13.** 35 U.S.C. § 112, as amended, provides in pertinent part:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any

person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

claims are infringed by the accused PCB force links.

Turning now to the accused PCB force rings, the record indicates that defendant has during the accounting period relevant to this proceeding procured numerous load rings which are in the form of an exchangeable machine element and are capable of permanent substitution in a structural assembly from PCB.

The figure illustrated below is a cross-sectional drawing of the accused PCB Model 211A. It is representative of PCB Models 201A to 207A and 211A to 217A force rings. Within each of these accused model series, the structural relationship of the parts is the same, with only the dimensions of the force rings varying from one model to the next. A further difference, which is not important to the question of infringement, is that Models 201A through 207A contain a built-in amplifier while the remaining accused models do not. Both the accused PCB force rings and the KIAG load washers are devices in which the quartz crystal measuring elements respond to substantially all of the force applied to the transducer. They are each capable of measuring forces between components of a structural assembly.

Cross Section of PCB Force Ring
Model 211A

Claim 1 of the '258 patent reads as follows:

A device for measuring forces between at least two components of a structural assembly, wherein at least one of said components is in the form of an exchangeable machine element, comprising

(a) component means having the physical dimensions of, and being capable of permanent substitution for, said machine element, and

(b) at least one piezo-electric crystal means lodged within said component means and serving as means for measuring the forces transmitted between said components.

All of the elements of claim 1 are found to read literally and substantively on elements found in the accused devices, as represented by the above figure.

The accused devices are force rings for measuring the forces between two components of a structural machine assembly. Moreover, the accused devices are *in the form* of washers, which are exchangeable machine elements as defined in the '258 patent. PCB's force rings also have, similar to plaintiff's, the physical dimensions of and are *capable* of permanent substitution for the machine elements that they replace. The PCB gauges also contain at least one piezoelectric quartz crystal lodged inside the component means (its upper and lower plates) for the purpose of measuring the forces transmitted between the two components of the structural assembly into which it is inserted.

Claim 2 recites that the component means of claim 1 are in the form of a washer. All of the accused devices are in the form of a washer as that term has been previously defined in establishing the scope of the claim.

Claim 3 recites that the washer of claim 2 is comprised of two discs, and that the crystal means are interposed between these discs. The upper and lower discs of the accused devices, although thicker than those shown by the figures of the patent in suit, are found to be discs within the definition of that word as used in this claim. PCB's upper and lower plates are found to perform the same function in substantially the same way as plaintiff's discs. Finally, the quartz crystal elements of the accused force rings are found to be interposed between

the upper and lower plates as called for by claim 3. Thus, the accused force gauges are found to infringe claim 3 of the patent in suit.

Claim 4 further limits claim 3 in that it calls for a disc being provided at its periphery with a sleevelike projection, and that the projection extends perpendicularly to the outer surface of the disc. It further requires that the sleevelike projection form the peripheral surface of the washer and terminate in a flange on the edge of the other disc. This is clearly shown in Fig. 4 of the patent in suit, which is for convenience reproduced below:

Fig. 4—Patent No. 3,151,258

In the figure, 47 and 48 represent the sleevelike projection found at the periphery of lower plate 46. The upper edge of the projection is flanged about the upper plate 45, as shown.

Defendant argues that it does not infringe claim 4 because the outer wall of each of its load cells are annular rings which are welded to the edge of the upper and lower plates substantially as shown in the hereinabove reproduced drawing of accused devices. Also, whereas the patented cell achieves preloading of its crystals by the downward force applied to the upper plate by the flanged edge of the sleevelike projection, defendant argues that all of the preloading in PCB's gauges is provided by the threaded engagement of its upper plate to the threaded inner wall. While the preloading of the accused rings undoubtedly depends upon the pressure applied from screwing the upper plate down the threaded inner wall, this is not the complete story.

For, as Mr. Sonderegger testified, if the preloading was achieved as PCB contends, the crystals would not be uniformly loaded. Instead, the preloading would vary radially along the entire annular crystal with the greatest preloading occurring at the inside periphery of the crystal proximate the threaded wall and the least occurring at its outside periphery. This nonuniformity of preloading would adversely affect the accuracy of all PCB force gauges.

In order to correct this, Mr. Sonderegger testified that the outer wall, which is actually an annular ring of considerable thickness, is welded to the upper and lower plates as shown in the above—referred—to drawing. Mr. Nicholas D. Change, Jr., an officer of PCB, testified that the annular outside housing served no purpose other than to hermetically seal and protect the force gauge from being damaged.

Mr. Sonderegger, on the other hand, testified that the annular outside housing contributed to preloading of the outer periphery of the crystal and thus served to eliminate the nonuniformity which existed in its absence. Mr. Sonderegger further testified that the outer housing would contribute to preload the crystals only if the bottom edge of the annular ring was welded before the top edge. While Mr. Sonderegger admitted that he had made no studies to establish whether the bottom edge of the annular housing was welded before the top edge, he testified that it would have to be done in that order to eliminate the uneven prestressing of the crystals and permit a linear operation of all accused load cells. Moreover, Mr. Change agreed that the bottom edge of the housing was welded before the top edge.[14]

While I have established that the patented and the accused load cells do accomplish substantially the same result, i. e., uniformly prestress the crystals used in the cells, that does not end my inquiry. Rather, it is necessary that the devices also "do the same work in substantially the same way, and accomplish substantially the same result

---

14. Mr. Change testified that PCB's housing is "welded at the bottom to the lower plate, and

it's again welded up at the top to the upper plate * * *."

* * *." *Machine Co. v. Murphy*, 97 U.S. 120, 125 (1877), cited with approval in *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950):

> Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136.

As stated in *Graver Mfg. Co.*, 339 U.S. at 609–10, 70 S.Ct. 854:

> A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of the evidence.

Plaintiff has presented no testimony or evidence at trial to show that the accused devices utilize a structure which is substantially the same as the flange structure recited in the '258 patent. Accordingly, I must conclude that claim 4 is not infringed by the accused devices.

Claim 6 of the '258 patent calls for the washer of claim 2 being provided with an annular recess substantially parallel to the upper and lower faces of the washer to receive the crystal. This claim is found to read on the Fig. 2 embodiment of the patent in suit. For example, the patent at col. 3, lines 53–55, explains:

> In the embodiment shown in Fig. 2 a washer 25 is provided with a slot 26 parallel to its bearing surface, which serves for receiving a crystal device 27.

In the accused devices, as represented by the above–reproduced drawing, two annular–shaped crystals are merely placed between the upper and lower faces of the cell. No annular recess to receive the crystals is utilized. Accordingly, the accused PCB force rings do not infringe claim 6 of the patent in suit.

Claim 7 is dependent upon claim 6. Thus claim 7 contains all of the limitations of claim 6. Since I have concluded that PCB's force rings do not infringe claim 6, they cannot infringe claim 7 either.

Claim 8 of the '258 patent further limits claim 2 by reciting that the washer serves to support a nut forming a part of the structural assembly, and that a slider ring or anti–friction washer is utilized between the washer and the nut. The literature supplied by PCB indicates that PCB routinely supplied anti–friction washers with the accused devices. Furthermore, the operating instructions which accompanied their cells clearly inform the purchaser that lubricated washers (anti–friction washers) should be used "in all cases where torque may be transmitted to the force ring." The accused cells are thus found to infringe claim 8 of the patent in suit.

### CONCLUSION

It is concluded that claims 1–4 and 6–8 of the Sonderegger patent No. 3,151,258 are valid and that claims 1–3 and 8 are infringed by PCB force rings which are used and/or manufactured by or for the defendant without authorization or license from plaintiff.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that claims 1 to 4 and 6 to 8 of United States Letters Patent No. 3,151,258 are valid and the piezoelectric transducers defined by claims 1 to 3 and 8 have been used and/or manufactured by or for defendant without authorization or license from plaintiff, that plaintiff is entitled to recover reasonable and entire compensation therefor, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 131(c)(2).